OPINION
{¶ 1} Zuri Flippin appeals from a judgment of the Montgomery County Court of Common Pleas, Juvenile Division, which granted permanent custody of two of her children to Montgomery County Children Services ("MCCS") and placed a third child in a permanent planned living arrangement ("PPLA").
 {¶ 2} MCSS obtained temporary custody of four of Flippin's children in February 2003. The children's ages ranged from a newborn to age 15. In June 2004, MCCS moved for permanent custody of the three youngest children, I.M., D.M., and D.F., and for a permanent planned living arrangement for the oldest child, D.G. The trial court granted MCCS's request with respect to D.M., D.F., and D.G. and remanded I.M.'s case for additional fact finding regarding her preference as to placement with a non-relative or with her foster parents. Additional details of these proceedings will be discussed below.
 {¶ 3} Flippin contends that the trial court erred in terminating her parental rights because MCCS had not made reasonable efforts to reunify her with her children and because she had made significant progress toward fulfilling her case plan.
 {¶ 4} A trial court may give a children services agency permanent custody of a minor child if it decides that the placement is in the best interest of the child and if the child has been in the temporary custody of the agency for twelve or more months of a consecutive twenty-two month period. R.C.2151.414(B).
 {¶ 5} MCCS obtained temporary custody of all of the children in February 2003 and retained custody through the hearing in January 2005. Thus, the children were in the custody of MCCS more than twelve of twenty-two consecutive months.
 {¶ 6} A child's best interest is determined by considering all relevant factors, including, but not limited to the following:
 {¶ 7} "(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
 {¶ 8} "(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
 {¶ 9} "(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period * * *;
 {¶ 10} "(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency."
 {¶ 11} R.C. 2151.414(D).
 {¶ 12} On review, this court must affirm the decision of the trial court unless its determination is not supported by clear and convincing evidence. In re Pieper Children (1993),85 Ohio App.3d 318, 326, 619 N.E.2d 1059. Clear and convincing evidence is proof that produces "in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." Id., citing In re Adoption of Holcomb (1985),18 Ohio St.3d 361, 368, 481 N.E.2d 118.
 {¶ 13} Two MCCS caseworkers who had worked on Flippin's case from February 2003 through the time of the hearing in January 2005 testified at trial. Starlisa Little handled the case during most of this period. She was familiar with the children's placements in foster care and, in the case of D.G., in a Visions for Youth program. She reported that the three children in foster care were doing well, that they were adoptable, and that each of the foster parents was interested in adoption. In the case of D.G., who was 15, Little indicated that three foster placements had failed, but that he was receiving counseling as part of the Visions for Youth program, and that a PPLA (planned permanent living arrangement) was recommended.
 {¶ 14} With respect to the fathers and other relatives of the children, Little testified that D.G.'s father was deceased and that the fathers of D.M. and D.F. were uninterested in the children and/or denied paternity. The only relative identified for any of the children was a paternal grandfather of D.F., but he had indicated that he was not in any condition to care for a child.
 {¶ 15} Little testified that she had discussed Flippin's case plan with her several times. The case plan required substance abuse treatment, mental health counseling, stable housing, stable income, and domestic violence counseling. Little described Flippin's progress and MCCS's efforts to help her in each of these areas in detail at the hearing.
 {¶ 16} With respect to her substance abuse, Flippin had admitting to using cocaine and marijuana for twenty years and to having "tried everything." The plan initially required outpatient treatment, and Flippin was referred to the Consumer Advocacy Program ("CAM") in February 2003. CAM referred her to Women's Recovery in March 2003, but she left that program the same month and returned to CAM. She was eventually referred to Sojourner House and Nova House as well. Flippin failed to complete any of these programs, citing a variety of reasons such as racist staff and the imposition of requirements beyond those included in her case plan. She was terminated from at least one program for poor attendance and drug usage.
 {¶ 17} Flippin was also required to obtain mental health counseling for her bipolar disorder. She began a program at Eastway in March 2003 but provided no information to MCCS about her progress, and she was no longer attending the program by October 2004. Flippin also reported to Little that she was off of her medication and was using marijuana instead to "help with her diagnosis."
 {¶ 18} The housing and domestic violence problems addressed by the case plan were interrelated. Flippin had stable housing for an extended period, but she was living with her abusive husband. Finding stable housing apart from her husband was one of the plan's requirements. MCCS referred Flippin for Section 8 housing, but she was ineligible due to an outstanding bill from a previous residence. The Sojourner House referral for substance abuse treatment would have included housing. Flippin refused to go because the Sojourner accommodations did not permit children, despite the fact that she did not have custody of her children at that time.
 {¶ 19} Flippin was referred to Artemis Center for domestic abuse counseling in April 2003, and she did receive a certificate of completion from Artemis. However, there had been additional instances of domestic violence after that time. Flippin claimed to be obtaining a protection order against her husband, but she never provided verification to MCCS that she had done so.
 {¶ 20} Flippin's visits with her children were sporadic. She missed a large number of visits and sometimes slept through visits when she did come. In October 2004, after missing a couple of months of visits, Flippin expressed a desire not to let her children see her "like this," referring to her use of drugs, weight loss, failure to take her medication, and other health problems.
 {¶ 21} In December 2004, a new caseworker, Iris Blanchard, took over Flippin's case. Blanchard recounted that Flippin had missed their first two scheduled meetings and had come to the office unannounced a couple of weeks later. Flippin reported that she had moved from her previous residence, but that she would be moving again in January and did not know where she would be going. She was living in a hotel at the time of the hearing. Flippin did not visit with the children while Blanchard was on the case, although they had talked about coordinating visits with the Sojourner program schedule, as Flippin claimed she was about to start that program. Flippin never got back to Blanchard about her schedule, nor did she verify that she had started at Sojourner or any other drug treatment program. At the hearing, Flippin reported that she had been unable to go to Sojourner because of an unpaid bill to the Dayton Municipal Housing Authority, and that she intended to seek treatment through Mercy Manor instead. Again, she did not provide any documentation. She was also unable to verify that she had received any mental health counseling.
 {¶ 22} In cross-examining the case workers, Flippin's attorney pointed out that she had not been included in unruliness and delinquency proceedings involving the oldest child, as provided by the case plan. Counsel also established that Flippin had not been included in the children's therapy. Little explained that the therapist had recommended against Flippin's involvement until the therapist developed a relationship with the children, but allowed for the possibility that Flippin would be involved later. Little acknowledged that the only housing referrals that MCCS had made for Flippin were Section 8 housing and the Sojourner House residential treatment program.
 {¶ 23} The guardian ad litem filed a report with the court in which he concluded that the children could not be returned to their mother within a reasonable time and that a permenent placement was in their best interests. He recommended the PPLA for D.G., and he recommended that MCCS be granted permanent custody of D.M. and D.F. For I.M., he recommended that custody be granted to Rhonda Stokes, Flippin's former foster sister. Stokes was in the process of completing a home study. The guardian ad litem also indicated that I.M. would be happy living with her current foster family if placement with Stokes did not work out.
 {¶ 24} After the hearing, the magistrate found that MCCS had made reasonable and diligent efforts at reunification but that Flippin had failed to remedy the conditions that had caused the children to be removed from her custody. Specifically, the magistrate noted that Flippin's substance abuse and housing problems had not been addressed, that she was unable to demonstrate parenting skills or a commitment to the children, and that she had unresolved mental health issues.
 {¶ 25} The magistrate concluded that, with respect to D.M., I.M., and D.F., clear and convincing evidence supported an award of permanent custody to MCCS. With respect to D.G., the magistrate recommended instituting the PPLA. Flippin filed objections to the magistrate's decision. The trial court adopted the magistrate's recommendations concerning D.M. and D.F. and granted permanent custody to MCCS. For D.G., the court approved the PPLA. Regarding I.M., the trial court noted that there was some uncertainty as to the child's preference for custody between her foster parents and Stokes, and it concluded that the magistrate should have conducted an in camera interview with the child. As such, I.M.'s case was remanded to the magistrate.
 {¶ 26} As mentioned above, Flippin appeals from the trial court's termination of her parental rights with respect to D.M., D.G., and D.F., raising one assignment of error. She claims that MCCS did not make reasonable efforts to facilitate reunification of the family and that she had made substantial steps toward compliance with the case plan objectives.
 {¶ 27} Neither of Flippin's assertions is supported by the record. MCCS provided a wide array of referrals and other support services to Flippin. Although she has identified a few ways in which MCCS might have been able to do more to assist her, such as providing additional housing assistance and involving her in counseling with the children, it is clear that these additional steps would not have resulted in her compliance with the case plan. Moreover, MCCS was required to make reasonable efforts at reunification, not Herculean ones. In other words, MCCS was not required to take every possible measure to assist Flippin so long as it made a reasonable, good faith effort to so do. The record supports the trial court's conclusion that MCCS had made the required effort.
 {¶ 28} Flippin's assertion that she had made substantial progress toward achieving the case plan objectives finds no support in the record. The only objective that she had arguably achieved was the completion of a domestic violence program at Artemis. However, the record established that, after completing this program, Flippin's abusive relationship with her husband had continued. Although she claimed that she would obtain a protective order against him, there is no evidence that she did so. Thus, the completion of the Artemis program did not appear to have substantially advanced the goal of protecting the children from Flippin's abusive relationship with her husband.
 {¶ 29} In other respects, Flippin made little, if any, progress toward achieving the goals of the case plan. She had not completed drug treatment and continued to use drugs, she did not have stable housing, and she was not in treatment or taking medication for her mental illness. Moreover, she had failed to maintain regular contact with the children through visitation. In light of the weak effort on Flippin's part to comply with the case plan and to make significant changes in her life, the trial court properly concluded that MCCS should have permanent custody of D.M. and D.F. and that D.G. should be placed in a PPLA.
 {¶ 30} The assignment of error is overruled.
 {¶ 31} The judgment of the trial court will be affirmed.
Donovan, J. and Milligan, J., concur.
(Hon. John R. Milligan retired from the Fifth District Court of Appeals sitting by assignment of the Chief Justice of the Supreme Court of Ohio).